[Cite as *Garrison v. Columbus*, 2026-Ohio-1981.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Robin Garrison, | : | |
| Appellant-Appellant, | : | No. 24AP-742 |
| | : | (C.P.C. No. 21CV-7986) |
| v. | : | (REGULAR CALENDAR) |
| City of Columbus, | : | |
| Department of Public Safety, | : | |
| Appellee-Appellee. | : | |
| | : | |
| Robin Garrison, | : | |
| Appellant-Appellant, | : | No. 24AP-743 |
| | : | (C.P.C. No. 22CV-162) |
| v. | : | |
| | : | (REGULAR CALENDAR) |
| City of Columbus, | : | |
| Civil Service Commission et al., | : | |
| Appellees-Appellees. | : | |
| | : | |

D E C I S I O N

Rendered on May 28, 2026

**On brief:** *William J. O'Malley*, for appellant.
**Argued:** *William J. O'Malley*.

**On brief:** *Zach Klein*, City Attorney, *Meredith W. Shell-Ayer*,
and *James A. Hogan*, for appellees.
**Argued:** *Meredith W. Shell-Ayer*.

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Appellant, Robin Garrison, appeals from a November 25, 2024 decision and entry of the Franklin County Court of Common Pleas affirming the order of the Columbus Civil Service Commission ("Commission") that terminated his employment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On July 8, 2021, Garrison was terminated from his position as a firefighter for the City of Columbus ("City"). Garrison appealed his termination to the Commission on July 15, 2021. A hearing was scheduled regarding discipline in case No. 20-008, which concerned Garrison's comments to Firefighter Jennifer Wilkinson. The hearing also included case No. 20-052, which involved Garrison's statement in the Fire Alarm Office ("FAO") on May 31, 2020. On November 4, 2021, the Commission Trial Board held a hearing on the two matters at which the following evidence was adduced. (Nov. 4, 2021 Tr. Vol. I at 7.)

{¶ 3} Jennifer Wilkinson began working for the Columbus Division of Fire in June 2017. (Tr. at 26.) In 2019, Wilkinson worked with Garrison at Fire Station 32 ("32"). (Tr. at 27.) According to Wilkinson, during one of her first encounters with Garrison, he became "a little bit more pushy, then was comfortable asking me deeper questions about political beliefs and almost prying at that point because I had given a few clues to not wanting to talk about it." (Tr. at 29.) Garrison also inquired into Wilkinson's personal life and relationship status. (Tr. at 29.) Wilkinson went on to describe an incident at the 2019 Christmas party. Wilkinson recalled arriving late to the Christmas party. Upon arrival, Garrison inquired why Wilkinson had come alone, to which she responded, "Is there a problem that I'm here by myself?" (Tr. at 30.) Garrison continued and stated, "Well, we need to find you a man." (Tr. at 30.) Wilkinson had never indicated that she would be bringing anyone to the party. (Tr. at 31.) According to Wilkinson, the questions made her "uncomfortable" and "curious as to why that was even crossing his mind." (Tr. at 31.) Later that evening, the firefighters posed for a group photograph. Wilkinson recalled that during the photo, Garrison "was standing over -- behind me, over my left shoulder. And he said that my butt doesn't look as bony in my jeans as it normally does in my work pants, my uniform pants." (Tr. at 31.) When Wilkinson asked why Garrison was "noticing [her] butt[,]" he responded, "something along the lines that he was just telling [her] that it was curvier in [her] jeans than in [her]

uniform and that he was just complimenting [her]." (Tr. at 31.) Wilkinson testified that the comments made her feel "[v]ery uncomfortable." (Tr. at 32.)

{¶ 4} Wilkinson did not initially report the incident at the Christmas party because the event was on personal time, and she "didn't want to make a huge deal about it if it was an isolated incident." (Tr. at 33.) A couple days later, Garrison came up to Wilkinson and stated that "he was informed that he potentially offended me and offered an apology that I didn't think it was a compliment." (Tr. at 34.) Wilkinson did not believe it was a sincere apology. "He didn't say that he was apologizing for saying anything inappropriate or being inappropriate. The apology was that I didn't think it was a compliment." (Tr. at 34.)

{¶ 5} During another interaction at the station, several firefighters were sitting around a table and someone stated, "at least [Garrison's] not always looking at [Wilkinson's] butt," to which Garrison replied, "Oh, it's not just her butt I'm looking at. It's everybody's butt I'm looking at." (Tr. at 34.) On another occasion, Wilkinson turned her back against the wall to Garrison to "get [her] point further across that that was a boundary that he crossed and to not do it again." (Tr. at 35.) Wilkinson later "lightheartedly" remarked, "Hey Garrison. I'm walking out of the room. Try to keep your eyes above my waist." (Tr. at 35.) Wilkinson then stated, "In fact, I'll just walk out backwards to save you some temptation," before she proceeded to walk out backwards. (Tr. at 35.)

{¶ 6} Wilkinson went on to describe a January 9, 2020 incident with Garrison in her dorm room. (Tr. at 36, 38.) According to Wilkinson, Garrison leaned in her doorway and stated that he had eavesdropped on a prior conversation with another firefighter about family dynamics. (Tr. at 38.) Garrison then asked whether Wilkinson thought "that [her] relationship with [her] dad has anything to do with [her] issues with men." (Tr. at 39.) When Wilkinson tried to deflect, Garrison continued asking similar questions. Wilkinson began "to get frustrated, kind of surprised I was even engaging in this conversation because it was just a blindside." (Tr. at 39.) Wilkinson explained that "[she does not] even have conversations like that with the people that [she was] close with at the fire station, so [she] was very confused and very uncomfortable." (Tr. at 41.)

{¶ 7} Wilkinson did not feel that Garrison could respect boundaries "if, one, he couldn't see them or, two, he saw them and chose not to respect them." (Tr. at 41.) Wilkinson explained that trust is extremely important for firefighters as "[y]our life is in each other's hands." (Tr. at 41.) Wilkinson discussed the January 9, 2020 incident with

Firefighter Joseph Zarbaugh and then reported it to Lieutenant Michael Lesko. (Tr. at 43-44.) Wilkinson later discussed the incident with Lieutenant Lesko, Lieutenant Bassetti, and Lieutenant Kerns. (Tr. at 44-45.) After the meeting, Wilkinson wrote a RT-154 form with a complete statement of all the incidents involving Garrison. (Tr. at 45.)

{¶ 8} On cross-examination, Wilkinson stated she did not recall whether Garrison introduced her to his girlfriend at the Christmas party. (Tr. at 46.) Wilkinson acknowledged her previous statement that she did not take Garrison's comment at the Christmas party "as joking, but it was lighthearted I would suggest." (Tr. at 48.) When Garrison came up to her after the Christmas party, he said, "Apparently I did something that offended you, and I owe you an apology." (Tr. at 51.) Wilkinson's comment "[d]on't look below my waist," was a "less confrontational way of trying to set a boundary." (Tr. at 52.) Wilkinson believed the conversation in the doorframe was the last time she worked with Garrison as he was transferred to the FAO. (Tr. at 56.)

{¶ 9} Zarbaugh worked in the Continual Quality Improvement Office ("CQI") for the Columbus Division of Fire. (Tr. at 57.) Zarbaugh recalled a conversation with Wilkinson in January 2020. (Tr. at 63.) Wilkinson informed him that "Garrison had come to her [dorm] room and asked her some personal things." (Tr. at 64.) Zarbaugh described Wilkinson during the conversation as physically uncomfortable and "shaking." (Tr. at 64.) They discussed how best to proceed, and Wilkinson ultimately decided to report the incident to Lieutenant Lesko. (Tr. at 66.)

{¶ 10} On cross-examination, Zarbaugh recalled hearing about the Christmas party incident. Zarbaugh acknowledged that he later asked Garrison whether he was "out here to harass my partner about her pants[.]" (Tr. at 67.) Zarbaugh conceded the comment was to "bust [Garrison's] chops." (Tr. at 68.) Zarbaugh explained that "the reason that I would do that would be just to let him know that I'm there, let her know that I'm there and that I'm paying attention to the situation." (Tr. at 71-72.)

{¶ 11} Lesko is the lieutenant on Engine 32 one unit for the Columbus Division of Fire. (Tr. at 73-74.) When Lesko found out about the incident at the Christmas party, he had an informal conversation with Garrison about how he should "think before he speaks." (Tr. at 76.) Lesko explained it was an unofficial discussion since the incident took place while they were not on duty. (Tr. at 76.) When Wilkinson later relayed the incident in the dorm room, Lesko "felt uncomfortable for her, the way she was telling it and felt

uncomfortable that she was put in that situation." (Tr. at 77.) Lesko spoke with the other lieutenants, including the union representative, and they concluded that they needed "to do something." (Tr. at 78, 87.) After discussing the matter, Wilkinson decided to report the incident "instead of making us have to do it." (Tr. at 79.) Lesko advised Wilkinson to include both the Christmas party and the January 9 incidents in the RT-154 form. (Tr. at 85.)

{¶ 12} Elizabeth Finnegan, an African American woman, worked with Garrison in the FAO on May 31, 2020. (Tr. at 92, 95-97.) On the date of the incident, Finnegan recalled there were protests all around Columbus in response to the murder of George Floyd. (Tr. at 96.) Finnegan commented that "it was hard to believe that in 2020 we were dealing with incidents like that." (Tr. at 96.) During the May 31, 2020 shift, Finnegan was stationed close to Garrison and recalled that an officer with Engine 15 asked for an estimated time of arrival on a row one and law enforcement. (Tr. at 98.) After Garrison ended the call, he stated, "Just stand on their neck and wait until they get there. It will be okay." (Tr. at 99.) Finnegan described Garrison's voice as a "nonchalant, whatever voice." (Tr. at 99.) Finnegan heard another individual "chuckle" at the remark. (Tr. at 99.) Finnegan characterized Garrison's volume as "loud enough for me to hear. . . It wasn't quiet. It wasn't a whisper. It wasn't an under your breath kind of thing." (Tr. at 99.) When Finnegan finished her call, she addressed the room stating, "I don't find anything about that funny." (Tr. at 99-100.) Finnegan acknowledged that Garrison later tried to apologize to the room. Finnegan testified as to her reaction to Garrison's statement. "I was shocked and appalled . . . in disbelief that it happened. . . . I couldn't see straight, hear. Like, it was just -- I was in shock. So I don't know exactly what was said at that point because I was just too upset to even hear what was going on." (Tr. at 100.) At the end of the shift, Finnegan went to her Lieutenant, Michael Keller, to address the situation. (Tr. at 101.) According to Finnegan, she tried to convey to him that there are "not a lot of people on the department, not a lot of people in the room that look like me or that kind of go through the same things as me. And when people make comments like that, it doesn't affect them the same way it affects me. It should, but it doesn't." (Tr. at 101.) Finnegan believed that Lieutenant Keller listened with empathy and did a good job of keeping them separated on shifts going forward. (Tr. at 102, 117.) Finnegan was interviewed by internal affairs soon after the incident. (Tr. at 103.) Finnegan remarked that her reaction was more measured under the circumstances as "it

wasn't my first time being the minority in a room." (Tr. at 114.) Finnegan explained that "if I went off -- using your term, if I go off on him, then I'm looking like the angry black woman. And that's negative on me, and so I learned to pick my battles and go about it the right way and keep my composure when I should have good off or I should have made a scene about it. But I learned." (Tr. at 115.) During another shift late at night, Garrison stated to Finnegan, "I want you to know that I look at you as part of the 1,600, not as part -- not as four." (Tr. at 103.) Finnegan told him she did not know what he was talking about and walked away. (Tr. at 104.) Finnegan later determined that Garrison must have read the transcript from her interview where she said there are 1,600 firefighters in the department and only 4 African American women. (Tr. at 104.) Finnegan told Garrison later that "[i]f you don't see me first as a female and then as an African-American female, then you don't see me, and that's part of the reason why we have this problem." (Tr. at 105.)

{¶ 13} On cross-examination, Finnegan discussed comments by other individuals during the protests. (Tr. at 110.) Finnegan acknowledged that she had only the two conversations with Garrison. (Tr. at 110.) Finnegan did not file a complaint regarding the second conversation. (Tr. at 112.)

{¶ 14} Keller is a FAO lieutenant for the Columbus Division of Fire. (Tr. at 117.) Keller recalled that Garrison "made a statement or a comment referring to standing on someone's neck." (Tr. at 118.) After the statement, Keller removed Garrison from the room to deescalate the situation. (Tr. at 119.) Keller told Garrison that the statement was offensive and unprofessional, which Garrison agreed. (Tr. at 119-120.) Keller recalled that Garrison later apologized for the comment to the entire room. (Tr. at 120.) Keller gave Garrison a "form PI-17" for counseling to "go over the rules, show him the rules that he broke." (Tr. at 120-121.) Keller was not involved in the subsequent investigation or decision to discipline Garrison for the incident. (Tr. at 122.)

{¶ 15} On cross-examination, Keller stated that the referral for counseling was based on violating Rule 8 of the City of Columbus Central Work Rules for a comment that was insensitive/offensive and unprofessional. (Tr. at 123.) Keller was aware that there was an ongoing equal employment opportunity ("EEO") investigation into Garrison at the time he referred him for counseling. (Tr. at 125.) Keller did not intend to impede that investigation by issuing the counseling referral. (Tr. at 125.) Keller believed that there were approximately eight people in the FAO who heard the comment. (Tr. at 127.)

{¶ 16} Kathleen Bourke was the Assistant Director of EEO Compliance with the City of Columbus' Department of Public Safety from July 2019 through July 2021. (Tr. at 128-129.) In that role, "any time someone within those divisions filed a complaint related to an allegation of discrimination, harassment or retaliation in the workplace, I would receive those complaints and investigate those complaints." (Tr. at 130.) Bourke investigated the two separate complaints against Garrison. (Tr. at 130.) Regarding the first incident, Bourke concluded through her investigation that "Garrison had made inappropriate and/or sexually harassing comments to Firefighter Wilkinson which violated the City of Columbus' anti-harassment and sexual harassment policy." (Tr. at 132.) Bourke also concluded that Garrison "retaliated against Firefighter Wilkinson by attempting to discredit her based on her sex and gender, which was also a violation of the City of Columbus policy." (Tr. at 132.) Bourke recalled that Garrison was interviewed twice during that investigation. Subsequent to the first interview, Garrison provided a document that made allegations against Wilkinson for improper conduct. (Tr. at 134.) After talking to Garrison and investigating the matter, Bourke concluded there was no new information that would suggest Wilkinson engaged in improper behavior. (Tr. at 135.) Bourke believed Garrison's claims were to retaliate against Wilkinson. (Tr. at 135-136.) "[I]n my experience it's very common for a sexual harassment type investigation to have an allegation from one person to another. So that part wasn't alarming to me. But what -- the alarming part to me was the tone of this written document that Firefighter Garrison had provided." (Tr. at 136.) Bourke believed the document "was incredibly personal. It was intentional, to try to make her look as bad as -- you know, that she should be ashamed, that no female would act like this. And it felt that it was personal and an overt attack on her character trying to discredit her." (Tr. at 136.)

{¶ 17} Turning to the incident at the FAO, Bourke concluded that Garrison "had made inappropriate or racially harassing comments while working in the [FAO]." (Tr. at 137.) Bourke interviewed Garrison multiple times and found he was forthcoming about the comments. (Tr. at 138.) Bourke, however, concluded Garrison was "quick to blame other people . . . I didn't feel that he ever really understood why what he had done was improper for the workplace." (Tr. at 138.) Bourke explained that she does not recommend or weigh in on the disciplinary process but was part of a meeting after the director's hearing that covered both complaints. (Tr. at 138.) Bourke recalled that Director Pettus asked her if

Garrison was honest in the investigation and whether he understood that the behavior was inappropriate. While Bourke believed Garrison was honest in the investigation, she did not think that he understood the behavior was inappropriate in the workplace. (Tr. at 139.) "[B]ecause [Garrison] seemed to blame the complainants that I was unsure if he really understood the severity of what happened or why it was important. And I was not convinced that he wouldn't continue to offend people with his comments in the workplace." (Tr. at 139.)

{¶ 18} On cross-examination, Bourke noted that while she did not initiate the discipline, she "did have a finding that [Garrison] had violated the policy" for retaliation involving the first incident with Wilkinson. (Tr. at 141.) While Bourke informed both Garrison and Wilkinson that they could supplement their interview in writing, Bourke believed the "tone of the information [Garrison] provided," which was the basis of the retaliation claim, "was a personal attack on [] Wilkinson based on her sex and gender." (Tr. at 143.) Bourke explained that Garrison accused Wilkinson of "using her sex, her gender, a female to basically flirt with Lieutenant Lesko to get her way, and then he had no information to back that up." (Tr. at 145.) Bourke went on further that "[t]he unusual thing about this was the tone with which Firefighter Garrison talked about Firefighter Wilkinson. You know, he said she should be ashamed of herself, that no female would do this, that they would be too embarrassed to do this. And it was – [i]t felt personal, and it was related to her sex or gender, trying to discredit her. That was the unusual part of it." (Tr. at 162.)

{¶ 19} Bourke explained that once an investigation is complete there is a separate disciplinary process. (Tr. at 151.) Bourke believed that the City takes her investigation and looks to see what would be "the appropriate work rule violation to charge someone within the disciplinary process." (Tr. at 155.) When Bourke received Garrison's statement, she discussed it with Lieutenant Wonn, as well as potentially Captain Dan Gatley, before she determined it constituted retaliatory behavior. (Tr. at 157.) Bourke recalled that Wonn and Gatley both agreed with her assessment. (Tr. at 157.)

{¶ 20} Assistant Chief David Baugh served as the administrative chief between 2019 to early 2021. (Tr. at 174.) Baugh handled reviewing and adjudicating cases that were investigated by the Administrative Investigations Unit ("AIU"). (Tr. at 174.) Baugh adjudicated the cases regarding Garrison, "presented the charges to the chief, presented the charges to the director, Director Pettus at the time, and then served notification results of

the hearings to Firefighter Garrison." (Tr. at 174.) Baugh was also responsible for drafting the charges against Garrison. (Tr. at 176.) Baugh noted that while the January 9, 2020 conversation between Garrison and Wilkinson was not a specific violation, it was part of the complaint and the ensuing investigation as "throughout all of the interactions between Ms. Wilkinson and Mr. Garrison, starting with the comment at the Christmas party, there was a series of events that happened that led to the formal complaint being filed so it could be investigated." (Tr. at 177.) Baugh believed, from his observations at the hearings, that Garrison "didn't understand the gravity of -- the weight of his comments and how his behavior and comments made Ms. Wilkinson feel, as though she was being treated unfairly and discriminatory." (Tr. at 178.) Baugh recalled that the chief's recommended discipline for case No. 20-008 was a 240-hour suspension, which the director suspended. (Tr. at 179.) In case No. 20-052, the chief's recommended discipline was termination. (Tr. at 179.) Baugh explained that while the director's initial discipline "was a 240-hour suspension and termination[,] . . . 140 hours and termination would be held in abeyance, meaning that [Garrison] would only have to serve 100 hours; and as long as he didn't repeat any similar violations for Case 20-052, he would be able to remain employed as long as he didn't have any similar violations within three years." (Tr. at 191.) When Garrison declined to sign the agreement, the director handed down a ruling of termination. (Tr. at 179.)

{¶ 21} On cross-examination, Baugh reiterated that the events of January 9, 2020 did not warrant a separate charge, but it "lent itself to the story that was unfolding regarding the relationship between Ms. Wilkinson and Mr. Garrison." (Tr. at 181.) On redirect, Baugh stated that he was aware of Garrison's multiple disciplinary infractions prior to these two incidents. (Tr. at 184.) "One was dishonesty regarding where he was at for work, and he served 48-hour suspension. And the other was an incident that involved him exposing himself to a civilian while in uniform. And by exposing himself, I mean exposing his genitals to a civilian while in uniform. And he was offered a last chance agreement for a certain time frame." (Tr. at 184-185.) That last chance agreement had expired by the time of these new cases.

{¶ 22} Christine Hiller has been in a relationship with Garrison for approximately eight years. (Tr. at 198.) Hiller recalled attending the 2019 Christmas party at the World of Beer and the Funny Bone. (Tr. at 199.) Hiller drove Garrison to the Christmas party as he had "some drinks" at home prior to the event. (Tr. at 199.) During the evening, Garrison

introduced Hiller to Wilkinson. (Tr. at 200.) Hiller believed that there was "the thought that [Wilkinson] was bringing somebody" to the party. (Tr. at 200.) Hiller recalled Garrison asking Wilkinson where her date was, which Wilkinson responded that she came alone. (Tr. at 200.) Hiller remembered Garrison, in a "joking manner," state that "they needed to find her a man." (Tr. at 201.) Hiller believed Wilkinson laughed and said that "she couldn't find a man that could handle her." (Tr. at 201.) Hiller later heard Garrison state to Wilkinson, "Your butt doesn't look as bony in those jeans as in your work pants." (Tr. at 202.) Hiller remembered thinking that Garrison had had a lot to drink and "he's probably not going to remember later what he had said." (Tr. at 203.)

{¶ 23} Garrison started working as a firefighter for the City in 1997. (November 5, 2021 Tr. Vol. II at 213.) Garrison recalled attending the Christmas party at the World of Beer and the Funny Bone. (Tr. at 216.) When asked if he was intoxicated during the Christmas party, Garrison replied, "I know that I was feeling pretty good. Absolutely. And there are things that [were] said that I don't remember." (Tr. at 217.) Garrison believed that during a prior discussion about the party, Wilkinson indicated she would be bringing a date. (Tr. at 217.) Garrison acknowledged that he stated to Wilkinson, with a "big smile on [his] face," "Hey, your butt doesn't look as bony in your jeans." (Tr. at 220.) Wilkinson did not say anything in response. "She just looked at me." (Tr. at 221.)

{¶ 24} The next day at work, Garrison asked Firefighter Andy Hill whether he made a comment about Wilkinson's "bony butt," which Hill confirmed. (Tr. at 222.) While Hill advised Garrison to "[l]et it lie," Garrison decided to apologize to Wilkinson for the comment. (Tr. at 222.) Garrison explained that he "wanted her to realize that I was just trying to tease her like I would tease any other firefighter." (Tr. at 223.) Garrison stated to Wilkinson, "I did not mean it in a negative way at all. If anything, take it more like a compliment." (Tr. at 223.) Garrison believed the apology was heartfelt. (Tr. at 225.)

{¶ 25} According to Garrison, Wilkinson, while walking past him in a small hallway, backed up against the wall. "I knew what she was doing. She was teasing me, you know what I mean, the way we banter." (Tr. at 225-226.) On another occasion, Wilkinson "got that big grin on her face again, turned backward and started backing out of the kitchen." (Tr. at 226.) Garrison recounted another time when he was in the kitchen and Wilkinson stood up and stated, "Hey Garrison. I'm going to back out of the kitchen now. Try to keep your eyes above my waist." (Tr. at 227.) Wilkinson then added, "That way you don't have

to look at my butt." (Tr. at 227.) Wilkinson acknowledged stating in reply, "I look at everyone's butts" because he did not "want her to feel like she's being singled out in any way." (Tr. at 228.) "[S]he wanted to be treated like one of the guys, so I'm trying to not treat her differently. So that's why I made that comment. You know, we tease each other all the time about any -- anything about ourselves." (Tr. at 228.) Garrison went on to describe comments from other firefighters to explain the culture of first responders. "It's kind of a -- like, not a sick humor, but a dark humor is the way to describe it." (Tr. at 230.)

{¶ 26} Garrison recalled overhearing the conversation between Wilkinson and Firefighter Scott Norris. (Tr. at 231.) Garrison was in the TV room with the two firefighters when he overheard their conversation about family dynamics. (Tr. at 232.) Garrison believed that Wilkinson knew he overheard the conversation. Garrison later asked Wilkinson whether her relationship with her father had caused problems with other men. (Tr. at 235.) When Wilkinson responded, Garrison thought "it was not -- I felt it. I could feel it was not the same way that she was feeling and talking in the TV room. I got that right -- right away, as soon as she made that response." (Tr. at 235.) Garrison stated that he never discussed the conversation with Wilkinson because he "was not given the opportunity." (Tr. at 238.)

{¶ 27} Concerning the retaliation claim, Garrison stated he had brought the document he later submitted during the first meeting with Bourke and Gatley. (Tr. at 239.) Prior to the interview, Garrison was informed that he was transferred to the FAO because of his comment to Wilkinson. Garrison was instructed to write down everything "while it's still fresh." (Tr. at 239.) Garrison intended to read the statement during the interview, but Bourke and Gatley wanted him to submit it instead of reading it into the record. "I didn't feel comfortable with that." (Tr. at 244.) Garrison decided to submit the statement a few days later. (Tr. at 246-247.) Garrison did not believe he was retaliating against Wilkinson. (Tr. at 247.)

{¶ 28} Garrison recalled the events in the FAO on May 31, 2020. (Tr. at 248, 282.) After completing a call inquiring how long before assistance, Garrison responded, "something about step on their neck, something like that." (Tr. at 252.) According to Garrison, he was trying to make a joke, but he "knew it was terrible as soon as it came out of [his] mouth." (Tr. at 252.) After Garrison walked out of the room, he apologized to his lieutenant. Garrison offered to apologize to the room. (Tr. at 253.) Garrison was later given

a written counseling form, which he agreed was appropriate. (Tr. at 254.) While Garrison and Finnegan continued to work together, there were no additional incidents. (Tr. at 255.)

{¶ 29} On cross-examination, Garrison acknowledged that he was suspended in 2008 and 2012. (Tr. at 259, 262.) In 2012, Garrison initially received a 48-hour suspension that was modified through agreement to an 8-hour discipline. (Tr. at 262.) Garrison transferred to 32 in the middle of 2019. (Tr. at 262.) Garrison acknowledged he had not spent a lot of time with Wilkinson before the Christmas party due to a prior injury and his work in the FAO. (Tr. at 263.) While Garrison was advised to drop the matter, he wanted to apologize to Wilkinson because he wanted to "treat her like one of the guys." (Tr. at 272.) Garrison conceded that he told Wilkinson she should take his comment "more like a compliment." (Tr. at 273.) Garrison believed that during the January 9 incident, he was not in the doorway but "outside of her door." (Tr. at 275.)

{¶ 30} Garrison acknowledged he had an opportunity to discuss the contents of the letter in a second interview. (Tr. at 281.) Garrison made an allegation about Wilkinson's use of the bathroom but could not provide a timeline or date. (Tr. at 282.) Regarding the comment in the FAO, Garrison did not recall whether he heard Finnegan state that she did not think the comment was funny. (Tr. at 284.) Garrison recalled making the statement to Finnegan that he saw her as "one of 1,600" not one of four. (Tr. at 286.) Garrison noted documents that showed he received sexual harassment training or employment opportunity training in 2018. (Tr. at 288.) Garrison also acknowledged documentation that said he received anti-harassment and sexual harassment training in 2019 but believed that was not accurate. (Tr. at 289.) When asked "[d]o you know that at the core of the murder of George Floyd was a police officer in uniform, on duty putting his knee on his neck to deny him oxygen for nine-and-a-half-minute period which -- which is -- was given as the cause of his death?" (Tr. at 300.) Garrison responded, "I didn't know all of that information, no, sir." (Tr. at 300-301.)

{¶ 31} On December 13, 2021, the Commission issued an order upholding Garrison's termination. On December 28, 2021, Garrison appealed the Commission's order of termination to the Franklin County Court of Common Pleas. On January 7, 2022, Garrison filed a second notice of appeal identifying both the Department of Public Safety and the Commission. On March 25, 2022, the administrative appeals in case No. 21CV-7986 and case No. 22CV-162 were consolidated.

{¶ 32} On November 25, 2024, the Franklin County Court of Common Pleas issued a decision and entry affirming the order of the Commission. The common pleas court concluded that Garrison violated Rule 2, Rule 8, and the City's anti-harassment and sexual harassment policy. The common pleas court then found that, given Garrison's previous disciplinary record, termination was an appropriate sanction.

{¶ 33} Garrison filed a timely appeal. After this matter was fully briefed, oral arguments were held on May 15, 2025. On October 8, 2025, Garrison filed a motion for leave to file supplemental authority regarding his second assignment of error. Appellees filed a memorandum in opposition on October 15, 2025.

## II. ASSIGNMENTS OF ERROR

{¶ 34} Garrison assigns the following assignments of error for our review:

> 1. The Common Pleas Court acted unreasonably, arbitrarily, and unconscionably when it found Mr. Garrison was properly and fairly terminated from his position as a firefighter for making an insensitive comment.

> 2. The Common Pleas Court Judge committed reversible error when she failed to recuse herself, or at a minimum, failed to advise Counsel of her personal claims of discrimination and offered Counsel the opportunity to file a motion for recusal.

## III. STANDARD OF REVIEW

{¶ 35} R.C. 124.34 controls the appeal procedure from an administrative action involving the suspension, fine, demotion, or removal of " 'any member of the police or fire department of a city or civil service township, who is in the classified civil service.' " *Baron v. Civ. Serv. Bd.*, 2012-Ohio-6179, ¶ 13 (2d Dist.), quoting R.C. 124.34(C). In such cases, the appointing authority or trial board "may affirm, disaffirm, or modify the judgment of the appointing authority. An appeal on questions of law and fact may be had from the decision of the commission to the court of common pleas in the county in which the city or civil service township is situated." R.C. 124.34(C).

{¶ 36} The Supreme Court of Ohio has noted that an "appeal on questions of law and fact" is relatively rare for civil service employees disciplined under R.C. 124.34(A). *Westlake Civ. Serv. Comm. v. Pietrick*, 2015-Ohio-961, ¶ 24. "R.C. 124.34 'provides two separate procedures, one for civil servants who are not policemen or firemen and another for civil servants who are police or fire officers.' " (Further quotation marks deleted and

citations omitted.) *Id.*, quoting *Chupka v. Saunders*, 28 Ohio St.3d 325, 331 (1986) (Brown, J., concurring). The Supreme Court found that R.C. 124.34(C) permits only members of a city or township police and fire departments an appeal on questions of law and fact, which "constitutes a trial de novo." *Id.*; *see also Adebisi v. Toledo*, 2021-Ohio-1902, ¶ 11 (6th Dist.) (finding administrative appeals brought pursuant to R.C. 124.34(C) are reviewed de novo). In a "trial de novo," the court of common pleas may "substitute its own judgment on the facts for that of the commission, based upon the court's independent examination and determination of conflicting issues of fact." (Internal quotation marks deleted and further citation omitted.) *Id.* at ¶ 25.

{¶ 37} While the common pleas court's review is de novo, appellate courts review a common pleas court's judgment on a R.C. 124.34 appeal from a decision of the civil service commission for abuse of discretion. *Baron* at ¶ 19, citing *Sandusky v. Nuesse*, 2011-Ohio-6497, ¶ 47 (11th Dist.), citing *Raizk v. Brewer*, 2003-Ohio-1266, ¶ 10 (12th Dist.) and *Ward v. Cleveland*, 2002-Ohio-482 (8th Dist.). We will not reverse a decision for abuse of discretion unless the determination is deemed unreasonable, arbitrary, or unconscionable. *State v. Beasley*, 2018-Ohio-16, ¶ 12, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A decision is deemed unreasonable if there is no sound reasoning process that would support it. *State v. Ford*, 2019-Ohio-4539, ¶ 106, citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A reviewing court lacks the authority to conclude a trial court abused its discretion merely because we might not have reached the same conclusion or because we are "less persuaded by the trial court's reasoning process than by the countervailing arguments." (Further citation omitted.) *State v. Morris*, 2012-Ohio-2407, ¶ 14.

## IV. ANALYSIS

### A. Garrison's First Assignment of Error

{¶ 38} In Garrison's first assignment of error, he argues the common pleas court abused its discretion by finding that he violated Rule 2, Rule 8, and the City's anti-harassment policy. Garrison goes on to argue that even if it was reasonable to conclude that he violated the above rules, the common pleas court abused its discretion by finding that termination was an appropriate sanction. Preliminarily, we note that Garrison did not appeal his suspension in case No. 20-008 involving his comments to Wilkinson. Therefore,

we will focus on the violations that stem from Garrison's May 31, 2020 comments in the FAO.

{¶ 39} The City alleged Garrison violated Rule 2 (Abusive or Violent Behavior); Rule 8 (Failure of Good Behavior), and the City's anti-harassment and sexual harassment policy.

{¶ 40} Rule 2 (Abusive or Violent Behavior) provides:

All employees should at all times conduct themselves in a polite and civil manner toward other City employees and any member of the public with whom they may come in contact in the performance of their duties. Employees shall not abuse any City employee or a member of the public under any circumstances. Employees threatened with verbal or physical abuse or violence should report it pursuant to the Policy Regarding Workplace Violence or to law enforcement authorities if necessary, rather than responding to the behavior in a similar manner.

. . .

(B) Discriminating, harassing, or insulting any City employee or member of the public because of their race, color, sex, age, religion, national origin, disability, gender identity or expression, genetic information, military status, or sexual orientation.

{¶ 41} Rule 8(A), (B), and (D) (Failure of Good Behavior) directs:

All employees are expected at all times to exercise common sense and conduct themselves in an appropriate professional manner. Employees should always be polite, courteous, considerate of co-workers and members of the public, and helpful to all. They should refrain from any conduct which might be offensive or demeaning to their co-workers or members of the public with whom they come in contact during the performance of their duties.

(A) Disrupting the normal work routine by creating unnecessary noise, by starting or participating in arguments, or by otherwise interfering with the work operations or the work performed by co-workers.

(B) Being rude, unprofessional, speaking loudly, or otherwise failing to be civil and courteous to any City employee or a member of the public, including but not limited to the use of profanity, insults, slurs, or derogatory or demeaning language either in person, or through any electronic device or medium.

. . .

(D) Behaving in an immoral or indecent manner, or engaging in conduct that gives the appearance of impropriety.

{¶ 42} Finally, the City's anti-harassment and sexual harassment policy provides in relevant part:

> It is the policy of the City of Columbus to create and maintain a working environment free from discrimination or harassment of any kind, including sexual harassment.
>
> The City of Columbus requires all employees to report any concerns or complaints of harassment and will take appropriate and immediate action in response to those complaints. Through enforcement of this policy and by education of employees The City will seek to prevent, correct and discipline behavior that violates this policy.

{¶ 43} Garrison presents several arguments contending that the common pleas court abused its discretion by finding that he violated the City rules and anti-harassment policy. Garrison first argues that the City failed to show how his comment violated its policies. (Appellant's Brief at 40-43.) Garrison also contends that the comment was not racist and did not incite violence. (Appellant's Brief at 31.)

{¶ 44} Upon review, we conclude that the common pleas court's reasoning and finding that Garrison violated the City's rules and anti-harassment policy is sound. Here, there is no dispute that Garrison made the "stand on their neck" comment. Even outside the context of the protests, Garrison's "stand on their neck" comment in a room full of firefighters, one of which is African American, condones abusive or violent behavior. However, we cannot look at the statement in isolation. As aptly contextualized by the common pleas court, Garrison's comment occurred during a period "when protests were breaking out all over the country, including in Columbus, and only days after the murder of George Floyd, an African-American, by a Minneapolis police officer who stepped on his neck." (Nov. 25, 2024 Decision at 26.) Garrison explained that he intended the statement to be heard by others as a "joke" to lighten the mood during a tense period. Implicit in Garrison's testimony is the admission that he wanted the individuals in the FAO to hear the remark. The fact that the comment was not "directed" at any one person is immaterial as the comment was intended for everyone in the FAO, which includes Finnegan, at that time. Therefore, the context of the comment, i.e. during the George Floyd protests, only compounds the abhorrent nature of the remark.

{¶ 45} Garrison's claim that the common pleas court did not explain its conclusion is baseless and ignores the court's well-reasoned decision. The common pleas court

succinctly explained how the comment violated each rule and policy writing, "[g]iven the context in which the comment was made, Garrison's comment was harassing language that was both discriminatory and insulting and in violation of Rule 2. It was also not considerate of co-workers or others who would be insulted and appalled by the comment, and was most definitely offense, demeaning, unprofessional and abrasive, and in violation of Rule 8. It was also discriminatory and harassing and in violation of the City's Anti-Harassment and Sexual Harassment Policy." (Nov. 25, 2024 Decision at 26-27.) Given the context and nature of the "stand on their neck" remark, the common pleas court's conclusion that the comment violated Rule 2, Rule 8, and the City's anti-harassment policy, is more than reasonable.

{¶ 46} Turning to the common pleas court's finding that termination was an appropriate sanction, Garrison noted that termination was too severe of a punishment as he apologized for the remark realizing that "his attempt at dark humor failed." (Appellant's Brief at 34.) Garrison contends that one comment is not sufficient to warrant termination. (Appellant's Brief at 40-43.) Garrison also argues that the lieutenant that heard the comment determined the appropriate managerial action was to give him counseling. (Appellant's Brief at 36-37.) Garrison also takes issue with the common pleas court's inclusion of the 2019 Christmas party incident as evidence of the arbitrary and unreasonable nature of the decision. (Appellant's Brief at 45-48.)

{¶ 47} We find Garrison's arguments that the common pleas court abused its discretion regarding his termination to be without merit. Garrison's comment, in the context of the time, is exactly the type of behavior the rules and policy are there to prevent. To be sure, Garrison did apologize soon after making the "stand on their neck" remark at the FAO. While an apology was an appropriate gesture, it does not absolve the behavior or unring the bell in this situation. Garrison fails to cite any authority, and we could find none, that stands for the proposition that one comment cannot support termination. Regardless, the single "stand on their neck" comment was not the sole reason for his termination. The common pleas court cited Garrison's disciplinary record, which includes prior violations of the same rules at issue in this case. In 2008, Garrison was suspended with a last chance agreement after he exposed his genitals to a civilian while wearing a uniform. Garrison was also suspended for dishonesty in 2012. In 2021, Garrison was suspended for 240 hours for his comment to Wilkinson at the off-duty Christmas party. While Garrison takes issue with

the inclusion of the Christmas party incident in the common pleas court's decision, he fails to provide any support as to why the common pleas court cannot consider prior offenses when determining the appropriate punishment. The inclusion of these prior infractions supports a basis for progressive discipline and evidence of his lack of understanding or remorse for such violations. As the common pleas court points out, it "makes sense to consider whether the employee understands why the conduct is not appropriate in the workplace." (Nov. 25, 2023 Decision at 29.) Furthermore, Garrison's continued insistence that the comment was a joke and not racist goes towards his lack of understanding why the conduct was not appropriate in the FAO. In any case, we are tasked with reviewing the common pleas court's decision, which considered the level of discipline imposed de novo. Garrison's contention that the lieutenant believed counseling was the appropriate punishment as persuasive authority is also unavailing. The lieutenant's efforts at discipline, even if well intended, does not remove the Commission's authority to impose a punishment on Garrison for the cited violations.

{¶ 48} Garrison next argues that the City permitted him to work for a year after he made the comment. (Appellant's Brief at 38-39.) Garrison explains that the City's acceptance of him in the workplace and continued service show his comment did not justify immediate termination. (Appellant's Brief at 43-44.) Garrison also argues he was selectively investigated and punished under the new EEO process. (Appellant's Brief at 49-51.)

{¶ 49} Garrison's arguments are without merit. During the period Garrison continued to work in the FAO, he was subject to two overlapping investigations, which took place during the COVID-19 pandemic. These delays became even more protracted by the "additional procedural protections due to Garrison's status as a union member, which further delayed the final conclusions of the investigations and disciplinary recommendations." (Nov. 25, 2024 Decision at 27.) We agree that such procedural protections for a union member and inherent delays during the pandemic amount to understandable justifications for the extended period that Garrison remained working at the FAO. We are also not persuaded that the delays undercut any justification for termination. It is reasonable to believe that, based on Garrison's repeated violations of the same rules at issue in this case, he has demonstrated an inability or unwillingness to follow

the rules going forward.[1]  Furthermore, Garrison's scapegoat argument lacks support as he fails to identify where in the record supports such a conclusion or why such action amounts to reversible error.  Accordingly, we find the common pleas court's decision to uphold Garrison's termination was not an abuse of discretion.

{¶ 50}  Accordingly, Garrison's first assignment of error is overruled.

**B. Garrison's Second Assignment of Error**

{¶ 51}  In Garrison's second assignment of error, he contends that the common pleas court judge committed reversible error by failing to recuse herself or disclose to counsel her recently filed discrimination complaint.  Specifically, Garrison argues that the common pleas court violated Code of Judicial Conduct Rule 2.2 and 2.11 by failing to disclose her complaint for racial and gender discrimination against other Franklin County Court of Common Pleas judges.

{¶ 52}  As a general matter, " '[a] judge is presumed to follow the law and not to be biased.' " (Further quotation marks deleted and citations omitted.)  *In re Disqualification of First Dist. Court of Appeals*, 2015-Ohio-2834, ¶ 5, quoting *In re Disqualification of George*, 2003-Ohio-5489, ¶ 5.  Without addressing the substance of Garrison's claim, there is nothing inherently prejudicial, without more, about a judge filing a complaint in their personal capacity that prevents them from ruling in an objective manner over similar subject matter in their own courtroom.

{¶ 53}  In any case, it is well established that this court has no jurisdiction over the enforcement of the Code of Judicial Conduct.  *State v. Hayes*, 2025-Ohio-2238, ¶ 18, citing *State v. Wright*, 2004-Ohio-677, ¶ 10 (10th Dist.).  "Judicial-misconduct complaints are heard by the Board of Professional Conduct and are ultimately decided by all justices of [the Supreme] [C]ourt." *In re Disqualification of Allen*, 2023-Ohio-3238, ¶ 35.  Furthermore, R.C. 2701.03 provides the exclusive avenue for a party to assert that a common pleas court judge is biased or prejudiced through the filing of an affidavit of disqualification.  *Hayes* at ¶ 19.  Regardless of when Garrison became aware of the judge's complaint, and purported violations of the Code of Judicial Conduct, the relief sought is not within the purview of this court.  Thus, Garrison's contentions that the judge violated the Code of Judicial Conduct

---

[1] The record reflects that Garrison previously violated Rule 2 and the City's anti-harassment and sexual harassment policy for his comments to Wilkinson. The record also reflects that Garrison previously violated Rule 8 in 2008 for indecent exposure and for his comments to Wilkinson.

and failed in its ethical duty during the case are beyond the reach of this court. *Hayes* at ¶ 20.

{¶ 54} Concerning the outstanding motion for leave to file supplemental authorities, upon review, we deny the motion regarding the inclusion of the referenced news article and pleadings in the common pleas court judge's discrimination case as they are irrelevant to our resolution of the second assignment of error. Even if we considered the referenced material, such information does not make this court the appropriate forum to resolve claims of bias or violations of the Code of Judicial Conduct.

{¶ 55} Garrison's second assignment of error is overruled, and his motion for leave to file supplemental authority is denied.

## V. CONCLUSION

{¶ 56} Having overruled Garrison's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Motion for leave to file supplemental authority denied*;
*judgment affirmed.*

JAMISON and EDELSTEIN, JJ., concur.

———————————